IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

ROBERT C. CARTER

                Plaintiff,

v.                                          CIVIL ACTION NO.  3:08-cv-01359

MONSANTO COMPANY, et al.,

                Defendants.


**ORDER**

Pending before the court in this class action suit is the plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction [Docket 35] and Motion to Remand for Voluntary Dismissal or in the Alternative for Voluntary Dismissal [Docket 50].  For the reasons herein, the Motion to Remand for Lack of Subject Matter Jurisdiction is **GRANTED** and the Motion to Remand for Voluntary Dismissal is **DENIED**.

I.      **Background**

This class action suit raises several claims based on the defendants' alleged disposal of the agricultural herbicide 2, 4, 5-trichlorophenoxyacetic acid ("2, 4, 5-T") and the herbicide's toxic byproducts from its chemical plant in Nitro, West Virginia (the "Nitro Plant").  Defendant Monsanto[1] began producing 2, 4, 5-T at the Nitro Plant in 1948 and continued producing the herbicide until about 1971.  During the Vietnam War, Defendant Monsanto sold 2, 4, 5-T to the

---

[1]  The other defendants in this matter have been sued as owners and operators of the Nitro Plant, or as successors to the liabilities of companies that owned or operated the plant during the relevant time period.

federal government to be used as a primary active component of the military herbicide Agent Orange.  (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 7.)  The production of 2, 4, 5-T results in the formation of a toxic byproduct called 2, 3, 7, 8-tetracholorodibenzoparadioxin, or "dioxin," and dibenzo furans ("furans").  (*Id.* ¶ 7.)

The class members in this case allege that the defendants' disposal of dioxins, furans and other hazardous waste materials generated by the production of 2, 4, 5-T into the Manila Creek dump site caused injury to persons living near and downstream from that dump site.  (*Id.* ¶¶ 8-21.) The class in this case is defined by geographic parameters and includes "[c]urrent property owners in the 100-year flood plain of Manila Creek . . . Heizer Creek . . . and the Potalico River . . . in Putnam County," which are all locations downstream from the Manila Creek dump site.  (Notice Removal, Ex. 2, Class Certification Order 2.)

This class action is just one of fifty-five civil suits filed in the Circuit Court of Putnam County of West Virginia ("Circuit Court"), seeking damages based on exposure to the substances produced at the Nitro Plant and their byproducts.  These suits, which I will collectively call the "Parallel Litigations," include fifty-three individual suits ("Individual Litigations"), and two class actions, including the instant matter and *Bibb et al. v. Monsanto Co. et al.*, No. 04-C-465 (Circuit Court, Putnam County, W. Va.).  The defendants removed all fifty-five Parallel Litigations to this court on November 21, 2008.  (Notice Removal.)  The defendants asserted that this court had subject matter jurisdiction over the Parallel Litigations based on the plaintiffs' recent revelation that their cases were based in part on injuries caused by the *production* of 2, 4, 5-T rather than just the *disposal* of that substance and its byproducts.  (*Id.* at 2-3.)  "[B]ecause Monsanto performed these production activities, or a substantial portion of them, under the aegis of the federal government and

-2-

as a federal officer . . ." the defendants explained that they could "assert[] federal defenses sufficient for removal under [the federal officer removal statute, 28 U.S.C.] § 1442." (*Id.* at 3, 6.) Specifically, the defendants asserted as federal defenses the government contractor defense and an immunity defense under the Defense Production Act, 50 App. U.S.C. § 2061 et seq. (*Id.* at 6.) The plaintiffs subsequently filed a motion to remand all of the Parallel Litigations on procedural grounds [Docket 9]. On December 19, 2008, I remanded all of the Parallel Litigations, except for this one, because their removal was untimely.

On March 20, 2009, the plaintiffs in this matter filed a new Motion to Remand [Docket 35] based on this court's lack of subject matter jurisdiction. Unlike the first motion to remand, in which the plaintiffs asserted procedural defects in removal, the instant motion challenges this court's subject matter jurisdiction. Specifically, the plaintiffs argue that they only seek relief from injuries caused by the *disposal* of 2, 4, 5-T waste into the Manila Creek dump site, which was not an activity "under the aegis of the federal government and as a federal officer." Contrary to the defendants' assertion, the plaintiffs argue that they are not seeking relief from any injuries caused by the *production* of 2, 4, 5-T.

Before this court ruled on the Motion to Remand, the plaintiffs filed another motion in which it renewed its Motion to Remand ("Renewed Motion to Remand") [Docket 50]. In that motion, the plaintiffs state additional grounds for remand. Specifically, the plaintiffs assert their intention to seek leave to voluntarily dismiss this action once it is remanded to the Putnam County Circuit Court. Because the Circuit Court is more familiar with the instant matter than this court, the plaintiffs argue that the Circuit Court is better suited to address the complicated issues associated with dismissing a class action. They further assert that remanding this matter for dismissal would "obviate any need

by this Court to address the other issues relating to this Court's jurisdiction . . . ." (Pls.' Mem. Supp. Renewed Mot. Remand 5 [Docket 50].) In the alternative, the plaintiffs seek permission from this court to voluntarily dismiss the case.

The defendants filed a response to the plaintiffs' Renewed Motion for Remand [Docket 56]. The defendants argue that the plaintiffs' Renewed Motion is inappropriate because: (1) they are "not entitled to raise additional arguments in support of a fully briefed motion pending before the court," (2) "the relative efficiencies of the state court are not a valid basis for remand," and (3) the motion was time barred because it was a motion for remand on grounds other than the court's lack of subject matter jurisdiction and was filed more than thirty days after removal. (Defs.' Mem. Opp'n Renewed Motion Remand 2, 6.) The defendants also argue that this court should not grant the plaintiffs' alternative motion for voluntary dismissal because such a ruling would render the past nine years of litigation a waste and would deprive the defendants of the right to have the question of government contractor immunity determined by a federal court.[2] The plaintiffs subsequently filed a Reply [Docket 58].[3]

## II. Discussion

### A. Motion to Remand Based on Plaintiffs' Intention to Voluntarily Dismiss

Because the plaintiffs' Renewed Motion to Remand suggests that I need not resolve the issues raised in its original Motion to Remand, I will address the plaintiffs' arguments in the

---

[2] On April 27, 2009, the defendants filed a Motion for Partial Summary Judgment Based on the Government Contractor Defense [Docket 47].

[3] The plaintiffs also filed a Notice of New Authority in Support of Plaintiffs' Renewed Motion to Remand [Docket 57]. The defendants filed a Response in Opposition to the Notice [Docket 59].

Renewed Motion and the defendants' response first.  As an initial matter, it would be inappropriate

for me to allow the voluntary dismissal of this matter prior to confirming this court's jurisdiction.

The plaintiffs' Motion to Remand has called this court's subject matter jurisdiction into question and

I have not yet ruled on that question.  When a court has doubts about its subject matter jurisdiction,

it should resolve those doubts before ruling on a motion for voluntary dismissal pursuant to Federal

Rule of Civil Procedure 41(a)(2).  *Taylor v. Com. of Va., Dep't of Transp.*, 170 F.R.D. 10, 12 (E.D.

Va. 1996).  Accordingly, I decline the plaintiffs' invitation to dismiss this matter prior to ruling on

the pending Motion to Remand.

Further, I reject the plaintiffs' suggestion that the Circuit Court's superior efficiency and

familiarity with this matter justifies remand.  Though such considerations may be appropriate for

a federal court deciding whether to exercise supplemental jurisdiction over state law claims, they

are inappropriate in this case because the case was removed based on federal officer removal.  The

underlying purpose of the federal officer removal statute, 28 U.S.C. § 1442(a), is to "protect[] . . .

the exercise of legitimate federal authority by government agents against interference by individual

states through their courts . . . ."  Wright, Miller & Cooper, Federal Practice & Procedure:

Jurisdiction 3d § 3727 at 136 (1998).  Such vital interests of the federal government take precedence

over concerns for judicial economy and efficiency.  Because I **FIND** it inappropriate to remand this

matter for voluntary dismissal in state court and also to permit voluntary dismissal in this court, the

plaintiffs' Renewed Motion to Remand [Docket 50] is **DENIED**.

Having denied that motion, I will proceed with my inquiry into this court's subject matter

jurisdiction over this class action.  "If at any time before the final judgment it appears that the

district court lacks subject matter jurisdiction, the case shall be remanded."  28 U.S.C. § 1447(c).

Therefore, I must determine whether the defendants can establish grounds for federal officer removal and whether this court has subject matter jurisdiction over this action.

### B.        Motion to Remand Due to this Court's Lack of Subject Matter Jurisdiction

The plaintiffs argue that this matter should be remanded because unlike the other Parallel Litigations, which had raised claims based on the emission of toxins from the Nitro plant that occurred during 2, 4, 5-T production, this action only concerns damages based on the defendants' disposal of 2, 4, 5-T waste at the Manila Creek dump site.  (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 4 [Docket 36].)  Because that disposal was not controlled by the federal government, the plaintiffs argue, this court does not have jurisdiction over the matter.  Before addressing the substance of the plaintiffs' motion, however, I must first discuss two preliminary issues raised by the parties.  First, I must determine whether my consideration of this court's subject matter jurisdiction is barred by the law of the case doctrine as asserted by the defendants.  (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 5 [Docket 41].)  Second, I must determine the scope of materials that I may review when assessing this court's subject matter jurisdiction.

### 1.        Law of the Case Doctrine Does Not Bar Review

"[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." *United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (alteration in original)).  This doctrine is based on the "sound policy that when an issue is once litigated and decided, that should be the end of the matter."  *United States. v. U.S. Smelting Refining & Min. Co.*, 339 U.S. 186, 198 (1950). Accordingly, the doctrine "promotes the finality and efficiency of the judicial process by 'protecting

-6-

against the agitation of settled issues.'" *Christianson*, 486 U.S. at 816 (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.404[1], p. 118 (1984)).  "Although the doctrine applies both to questions actually decided as well as to those decided by 'necessary implication,' it does not reach 'questions which might have been decided but were not.'" *Seijman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988) (quoting *Carpa, Inc. v. Ward Foods, Inc.*, 567 F.2d 1316, 1320 (5th Cir. 1978)).  Where the question at issue has not already been decided in the case, explicitly or by necessary implication, the law of the case doctrine does not apply.  *See United States v. Knox*, 363 F. Supp. 2d 845, 848 (W.D. Va. 2005).

Moreover, the law of the case doctrine is a discretionary rule and is only applied to the extent that it promotes the policies it was designed to protect.  *See U.S. Smelting Refining & Mining*, at 199; *Sejman*, 845 F.2d at 68-69; *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 520 (D. Md. 2007).  "[T]he law-of-the-case doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'"  *Christianson*, 486 U.S. at 817 (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912)).  Thus, "[a] court has the power to revisit prior decisions of its own . . . .'" *Id.* (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)).

The law of the case doctrine does not bar my consideration of this court's subject matter jurisdiction because I have never decided that issue.  I previously have determined only that the defendants' removal of this action to federal court pursuant to § 1442 was timely.  To demonstrate the narrow scope of my earlier decision, I will provide a more detailed procedural history of this case with a specific focus on the plaintiffs' first motion to remand.  On November 21, 2008, the defendants removed this matter pursuant to the federal officer removal statute, 28 U.S.C. § 1442.

-7-

As a basis for removal, the defendants asserted that they originally had believed that the plaintiffs' claims in those cases were based on "disposal-related releases of dioxin." (Notice Removal 2.) But on October 31, 2008, the defendants learned that the plaintiffs were "intending to develop evidence purporting to show injury from Monsanto's production practices." (*Id.*) Because the defendants produced 2, 4, 5-T "under the aegis of the federal government as a federal officer," the "revelation" that the plaintiffs sought damages based on *production* activities rendered the cases ripe for removal under 28 U.S.C. § 1442(a)(1). (*Id.* at 2, 4.)

The plaintiffs filed their first Motion to Remand this action on November 24, 2008 [Docket 9]. In support of their motion, the plaintiffs incorporated the memorandum of law attached to the Motion for Remand in *Bibb*.[4] (Mot. Remand.) In that memorandum, the plaintiffs argued that the removal of the Parallel Litigations was untimely and thus procedurally defective. (Mot. Remand, Ex. 2, *Bibb* Mem. Supp. Mot. Remand 2 ("*Bibb* Mem. Supp. Mot. Remand").) Referencing only the *Bibb* Complaint, the plaintiffs argued that the defendants had already known the plaintiffs were alleging injuries caused by production activities at the Nitro Plant. (*Id.* at 7.) They further explicitly stated that they were "only addressing the procedural defects in Defendants' removal, and reserve[d] the right to challenge the Court's subject matter jurisdiction at a later date, if necessary." (*Id.* at 2 n.1.)

I entered an Order on December 19, 2008 ("December 2008 Order") [Docket 21] in which I remanded all of the Parallel Litigations except for the instant matter. I found that the complaints

---

[4] Indeed, class counsel in the instant matter, who represent the plaintiffs in all of the Parallel Litigations, filed in *Bibb* the only substantive motion and memorandum of law among the Parallel Litigations. As in the instant matter, the *Bibb* motion to remand and memorandum in support were incorporated into the motions to remand for all of the Parallel Litigations.

in *Bibb* and the Individual Litigations were very similar and that those complaints provided notice of the plaintiffs' production-based claims. (December 2008 Order 27-30.) Accordingly, the removal of those actions, more than thirty days after the filing of the complaints, was untimely. I also found that the complaint in this case alleged injuries caused by the defendants' disposal of waste into the Manila Creek dump site rather than the production of 2, 4, 5-T. (*Id.* at 25.) I further found that the removal of the *Carter* action was timely because the earliest the defendants could have been on notice that "any claims in the *Bibb* litigation would also be relevant to the *Carter* litigation" was November 3, 2008. (*Id.* at 32.)

Significantly, the December 2008 Order did not address this court's subject matter jurisdiction. Further, it did not address whether the federal government's involvement with the activities at the Nitro Plant were sufficient to confer federal officer jurisdiction on this court. I explicitly stated that the December 2008 Order was concerned solely with the question of "when the defendants first had notice of production based claims." (*Id.* at 23 n.8.) I merely found that the plaintiffs' Rule 16 Pretrial Submission filed on November 3, 2008, "may have [put the defendants] on notice that any claims in the *Bibb* litigation would also be relevant to the *Carter* litigation." (December 2008 Order 32.) I therefore found that the removal of *Carter* was timely. I did not address the propriety of removal in any other respect. Accordingly, I have never determined that the instant matter "implicates [the defendants'] *production* of 2, 4, 5-T, and not merely the disposal of waste from those processes." (Defs.' Mem. Opp'n Mot. Remand Subject Matter Juris. 5.)

Because I have never determined whether the plaintiffs in this action allege injuries based on the *production* of 2, 4, 5-T at the Nitro Plant, the law of the case doctrine does not preclude my examination of that question and this court's § 1442 jurisdiction at this time. Even if I had made

such a determination, I would still have the discretion under the law of the case doctrine to re-examine these issues because my obligation to "reach the correct judgment under law" is at its apex "in the context of subject matter jurisdiction issues, which call into question the very legitimacy of a court's adjudicatory authority." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003) (explaining that the law of the case doctrine does not limit the court's power to reconsider earlier rulings in the context of subject matter jurisdiction issues). Having decided that I am not barred from examining this court's subject matter jurisdiction, I will now review the plaintiffs' preliminary argument regarding the documents that I may consider in the course of that examination.

### 2.    Scope of Reviewable Materials

The plaintiffs dispute the scope of the record that I may consider in resolving the instant Motion to Remand. Asserting that propriety of removal for federal officer removal is based solely on the jurisdictional facts alleged in the Notice of Removal, the plaintiffs argue that I should disregard the exhibits attached to the defendants' response that demonstrate the government's involvement in the 2, 4, 5-T production at the Nitro Plant. (Pls.' Reply 3 n.1 (citing *Pantalone v. Aurora Pump Co.*, 576 F. Supp. 2d 325, 239 (D. Conn. 2008)) [Docket 44].)

The plaintiffs are correct that a notice of removal should itself provide the jurisdictional facts supporting removal under § 1442(a). A defendant seeking removal under § 1442(a) must provide "candid, specific and positive" facts in his notice of removal showing that a plaintiff's claims are based on its conduct as a federal officer. *See Willingham v. Morgan*, 395 U.S. 402, 408 (1969); *Jamison v. Wiley*, 14 F.3d 222, 238 (4th Cir. 1994) (explaining that the defendant's specific allegations that the plaintiff's charges were based on his conduct as a federal officer and under color of his office were sufficient to establish a federal defense conferring removal jurisdiction under §

1442(a)).   Courts may, however, consider documents submitted after the notice of removal, including those attached to subsequent motions, when appropriate. *See Willingham*, 395 U.S. at 407 n.3.   In *Willingham*, the plaintiff sought remand of a case that had been removed pursuant to the federal officer removal statute because the defendants had not been acting in their official capacity. *Id.* at 407.   The only facts refuting the plaintiff's allegation were found in affidavits attached to the defendants' post-removal motion for summary judgment. *Id.*  The Supreme Court held that although the affidavits should have been attached to the notice of removal, it was proper to "treat the removal petition as if it had been amended to include the relevant information contained in the later filed affidavits." *Id.* at 408 n.3.

Courts have observed that the propriety of treating later-filed documents as amendments to a notice of removal depends on the content of the notice of removal and the record as a whole. *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 206 n.12 (3d Cir. 2003); *see also Buell v. Sears, Roebuck & Co.*, 321 F.2d 468, 471 (10th Cir .1963) ("If there were some suggestion in the record supporting . . . jurisdiction, we might deem the petition for removal amended to comport with the proof.").   Where subsequently-filed documents clarify allegations already stated in the notice of removal, a court may construe those documents as amending the notice of removal. *See USX Corp.*, at 206 n.12.

The defendants' Notice of Removal alleged with specificity that "[f]ederal officers . . . acting in the course of their official duties and under color of their office, compelled [the defendants] . . . to supply Agent Orange . . . for use by the United States military in Vietnam." (Notice Removal 6.) The defendants further explained that the federal officers' conduct allowed them to assert a government contractor defense sufficient for removal under § 1442.  These allegations in the Notice

of Removal were sufficient to demonstrate a "colorable" federal defense to the suit and to support

the requested removal.  *See Jamison*, 14 F.3d at 238.  The affidavits attached to the defendants'

Memorandum in Opposition to Motion to Remand do not provide new grounds for this case's

removability, but rather clarify the conduct of the federal officers and the relationship between the

defendants and the federal government.  Accordingly, it is appropriate for this court to consider the

affidavits and attached exhibits as amending the defendants' Notice of Removal and to review them

in determining this court's subject matter jurisdiction.

Having determined that my evaluation of this court's subject matter jurisdiction does not

violate the law of the case, and that I may consider the affidavits attached to the defendant's

response, I will proceed to determine whether the defendants have established this court's removal

jurisdiction pursuant to § 1442(a).

### 3. Federal Officer Removal Jurisdiction

Under 28 U.S.C. § 1442(a), a state court civil action commenced against a federal officer for

"any act under color of such office," may be removed to federal court.  28 U.S.C. § 1442(a)(1).  The

purpose of this statute is to ensure "the protection of the exercise of legitimate federal authority by

government agents against interference by individual states through their courts . . . ."  Wright,

Miller & Cooper, Federal Practice & Procedure: Jurisdiction 3d § 3727 at 136 (1998); *see also*

*Taylor v. Comsat Corp.*, No. 2:06-cv-0920, 2006 WL 3246508, at *2 (S.D. W. Va. Nov. 8, 2006.)

(Copenhaver, J.) ("The statute is rooted in federal supremacy and a mistrust of the ability of state

courts to protect federal interests.").  In order to remove an action pursuant to § 1442(a), a defendant

must establish that (1) it is a "person" within the meaning of the statute, (2) it acted under the

direction of a federal officer, (3) it has a colorable federal defense to the plaintiffs' claims, and (4)

there is a causal nexus or connection "between the plaintiffs' claims and acts it performed under color of federal office." *Virden v. Altria Group, Inc.*, 304 F. Supp. 2d 832, 843 (N.D. W. Va. 2004); *see Taylor*, 2006 WL 3246508, at *2.

The parties' debate with respect to the instant motion has focused primarily on the second and fourth elements.  Under the second element, a defendant acts under the control of a federal officer if the federal officer has "direct and detailed control" over the activity.  *Pack v. AC and S, Inc.*, 838 F. Supp. 1099, 1103 (D. Md. 1993) (citing *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992)); *see also Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 947 (E.D.N.Y. 1992) (citing *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990)).  A defendant can establish the federal officer's "direct control" by showing "strong government intervention and the threat that [it] will be sued in state court 'based upon actions taken pursuant to federal direction.'"  *Fung*, 816 F. Supp. at 572 (quoting *Gulati v. Zuckerman*, 723 F. Supp. 353, 359 (E.D. Pa. 1989)).  It is not enough that the defendant's actions occurred under the "general auspices of a federal office or officer" or that the defendant participated in a regulated industry.  *Ryan*, 781 F. Supp. at 947.  A private actor acts under a federal officer when it "*assist[s]*, or help[s] *carry out*, the duties or tasks of the federal superior."  *Isaacson v. Dow Chem. Co.*, 517 F. 3d 129, 137 (2d Cir. 2008) (quoting *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 127 S. Ct. 2031, 2307 (2007)) (emphasis in original).

Even if the defendant can satisfy the second element by showing that it acted under the direction of a federal officer, federal officer removal is only appropriate if the defendant can also establish the fourth element by demonstrating a causal nexus between the acts taken under federal control and the alleged acts underlying the plaintiffs' claims.  The causal nexus requirement does not establish a stringent standard: "[t]he statute does not require that the prosecution must be for the

-13-

very acts which the officer admits to have been done by him under federal authority." *Isaacson*, 517 F.3d at 137 (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)) (alteration in original).  The defendants in this case need only show that the federal direction created the circumstances underlying the liability.  *See Jefferson County, Ala. v. Acker*, 527 U.S. 423, 433 (1999).  Thus, the defendants may satisfy the causal nexus requirement by showing that "the acts for which they are being sued . . . occurred because of what they were asked to do by the Government," or that "the act that is the subject of [p]laintiffs' attack . . . occurred *while* [d]efendants were performing their official duties." *Isaacson*, 517 F.3d at 137-38.

In several parts of their memorandum, the plaintiffs conflate the second and fourth elements.[5] They argue that the defendants cannot establish the elements justifying federal officer removal because the defendants cannot show that their Nitro Plant disposal practices were conducted under federal control.  But the defendants need not show that the disposal practices, which form the basis of the plaintiffs' claims, were the same actions that were conducted under federal control.  They need only show (1) that they conducted some activity under the direct and detailed control of a federal officer, and (2) that because of that activity or in the course of performing that activity, they negligently disposed dioxins as alleged in the Complaint.  Accordingly, I will analyze the parties' arguments according to that framework.  But before I address the elements of federal officer removal, I will first delineate the nature and scope of the alleged acts underlying the plaintiffs' claims.

---

[5] Indeed, many courts do the same. *See, e.g., N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 403 n.7 (D.N.J. 2005).

### a.      Scope and Nature of the Plaintiffs' Claims

In order to determine whether the defendants have established the elements for federal officer removal, I must first determine the nature and the scope of the plaintiffs' claims.  The parties dispute the nature of those claims, specifically, whether the plaintiffs' claims are based in part on the defendants' *production* of 2, 4, 5-T rather than just *disposal* of 2, 4, 5-T waste.  The plaintiffs assert that this matter "has always unequivocally been about [the defendants'] dumping of 2, 4, 5-T waste at a remote location in Putnam County, and the subsequent waterborne migration of dioxins from the remaining waste at the dump . . . ."  (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 6.)

The defendants accuse the plaintiffs of recharacterizing their claims in the instant motion to be based only on disposal, rather than production *and* disposal activities as alleged in their Complaint.  (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 5.)  To support their contention that the plaintiffs in the instant matter are seeking damages also for production-based injuries, the defendants have cited to the plaintiffs' Circuit Court Rule 16 Pretrial Submission in *Bibb*.  In that document, plaintiffs' counsel stated that "[t]he relief sought for members of the *Carter* class, with the exception of perhaps the riparian rights claim, is the same relief sought in the *Bibb* class." (Notice Removal, Ex. 3, Plaintiffs' Rule 16 Pretrial Submission in *Bibb* at 1.)  The plaintiffs explain that this statement only shows that the plaintiffs in both actions were seeking the same remedies: property remediation and compensation for diminished property value.  (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 8.)  The fact that the plaintiffs were seeking the same remedies does not change the fact, the plaintiffs argue, that they are only seeking relief from injuries caused by the defendants' disposal practices.  (*Id.* at 9.)

The defendants also argue that a court's subject matter jurisdiction is determined by the record before the court at the time the case was removed. (*Id.* at 8.) Because the plaintiffs' claims at the time of removal included claims based on production as well as disposal, the defendant asserts that remand is inappropriate and the plaintiffs should not be allowed to narrow their case at this point in an attempt to avoid federal jurisdiction. Finally, the defendants argue that, contrary to the plaintiffs' assertions, the "*Carter* and *Bibb* cases are inexorably intertwined." (*Id.* at 9.) Because the class members in this action are also members of the *Bibb* action, and because they are seeking remedies for dioxin contamination on their property in both actions, the defendants argue that the actions are not distinct. (*Id.*) The defendants argue that "[i]n light of the important public policy interests underlying the federal officer removal statute, such specious distinctions [such as the source of the dioxin contamination] cannot form the basis upon which federal jurisdiction rests." (*Id.*)

As discussed above, the plaintiffs did not address in their first Motion to Remand whether the instant matter involved claims based on the defendants' production of 2, 4, 5-T. I only held that the defendants could not have had notice of such claims prior to the submission of the Rule 16 Pretrial Submission on November 3, 2008. I did find however that "[t]he injuries alleged in the *Carter* Complaint clearly stem from [the defendants'] *disposal* of dioxin contaminated waste at the Manila Creek site and the subsequent leaching of dioxin into neighboring waterways and property. The *Carter* plaintiffs did not allege any injuries based on the 2, 4, 5-T production process itself." (December 2008 Order 25.)

-16-

The Complaint[6] has without alteration stated claims based only on the defendants' disposal of 2, 4, 5-T byproducts at the Manila Creek dump site.  (*See* December 2008 Order 24-25.) Moreover, the defendants have provided no evidence that this matter involves claims for production-based injuries.  The Rule 16 Pretrial Submission upon which the defendants rely only states that the parties were seeking the same *remedies*, not that they were asserting the same *claims*.  Accordingly, I **FIND** that the plaintiffs have asserted claims based only on the defendants' *disposal* of 2, 4, 5-T dioxin contaminated waste at the Manila Creek dump site.

I recognize the implication of this finding—that if the Rule 16 Pretrial Submission did not in fact alter the plaintiffs' claims in this matter and render the action removable, then the defendants' removal of this matter was untimely.  The plaintiffs waived the right to challenge the timeliness of the removal on those grounds, however, by incorporating *Bibb's* Motion to Remand and Memorandum of Law into their Motion to Remand for this action.  They thus effectively conceded for the purposes of their first motion that the Complaint contained claims based on production-based activities.  They never argued that the Complaint did not contain production-based activities, nor that the defendants were incorrect in their assumption that the Rule 16 Pretrial Submission demonstrated the inclusion of such claims in the Complaint.   But the plaintiffs' concession for the purposes of their procedural challenge to the timeliness of removal does not change the scope of the claims asserted in the Complaint.  This court's subject matter jurisdiction depends on the actual scope of the plaintiffs' claims in this action.  Because this action only involves claims for injuries

---

[6] The plaintiffs amended their Complaint several times over the course of this litigation. The last-filed Complaint was the Corrected Fourth Amended Complaint.  (Notice Removal, Ex. 1, Corrected 4th Am. Compl.)  For the purposes of the instant order, I will refer to the Corrected Fourth Amended Complaint as the "Complaint."

caused by disposal at the Manila Creek dump site, and because the plaintiffs have waived their right to remand based on the untimely removal of those claims, the only remaining question is whether this court has subject matter jurisdiction over those claims by virtue of this court's federal officer removal jurisdiction under 28 U.S.C. § 1442(a).

          **b.**       **The Production of 2, 4, 5-T at the Nitro Plant was an Act "Under the Direction of a Federal Officer"**

The plaintiffs argue that the defendants did not act under the direction of a federal officer for two reasons. First, they argue that the alleged disposal of dioxin-contaminated waste occurred in the 1950s, before the defendants commenced Agent Orange production on behalf of the United States government. (Pls.'Mem. Supp. Mot. Summ. J. Subject Matter Juris. 12 n.2.) Second, they argue that the defendants' contract with the government was for the production of Agent Orange, and not the component substances manufactured at the Nitro Plant. (*Id.* at 14; Pls.' Reply 10-11.) Specifically, the plaintiffs assert that the 2, 4, 5-T produced at the Nitro Plant was an "off-the-shelf commercial herbicide" that "was not specially formulated and manufactured to U.S. government specifications," and not manufactured under federal control. (Pls.'Mem. Supp. Mot. Summ. J. Subject Matter Juris. 14-15.)

The defendants observe that the plaintiffs' assertions as to the relevant time period is misleading because the Fourth Amended Complaint clearly states claims that extend into the government contract period. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 7.) The defendants further submit that the defendants produced 2, 4, 5-T pursuant to "detailed and precise specifications" provided by the federal government. (*Id.* 11 (citing to Certification of Charles M. Love, III, dated April 3, 2009 ("Love Cert."), Ex. C.).)

i.      **The Defendants' Alleged Conduct Occurred After the Defendant Entered Into a Contract with the Government**

The plaintiffs cannot assert that their claims are based on contamination that occurred prior to the defendants' production of 2, 4, 5-T for use by the United States government.  The plaintiffs have not presented in this case a specific date on which the Nitro Plant began producing 2, 4, 5-T pursuant to a federal government contract or for federal government use.  Relying on other cases examining federal government contracts for the production of Agent Orange, the plaintiffs suggest that such production could not have occurred at the Nitro Plant prior to 1961, the year that the defendants began producing and delivering Agent Orange to the federal government.  (Pls.' Mem. Supp. Mot. Remand Subject Matter Jurisdiction 12 n.2 (citing *In re "Agent Orange," Product Liability Litigation*, 304 F. Supp. 2d 442, 449 (E.D.N.Y. 2004).)  But the instant matter is based on injuries caused by the defendants' disposal activities, not their production activities, and neither the Fourth Amended Complaint nor any other evidence on the record indicates that the defendants stopped disposing 2, 4, 5-T waste material at the Manila Creek dump site before 1961.  The Fourth Amended Complaint only states that the defendants *began* disposing of 2, 4, 5-T waste material no later than 1958; it does not state when such disposal ended.  (Notice Removal, Ex. 1, Corrrected 4th Am. Compl. ¶ 10.)  Moreover, the plaintiffs' factual allegations continue through the Vietnam War and the 1980s.  Because the plaintiffs' claims are not clearly limited to a time period prior to the time during which the defendants were manufacturing 2, 4, 5-T for use by the federal government, I reject the plaintiffs' argument.

ii.     **Some Aspects of the Defendants' Production and Distribution of 2, 4, 5-T Occurred Under the Control of a Federal Officer**

The plaintiffs argue that the defendants did not act under the control of a federal officer because although the defendants produced Agent Orange pursuant to a federal contract, it did not produce 2, 4, 5-T, the Agent Orange ingredient produced at the Nitro Plant, pursuant to government specifications. Accordingly, the plaintiffs argue that the defendants' production of 2, 4, 5-T at the Nitro Plant was not produced under the "aegis of a federal officer." (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 14.) The defendants disagree and assert that the federal government did provide specifications for the production of 2, 4, 5-T. (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 11.)

Documents provided by the defendants show that the federal government and its officers were actively involved in the defendants' 2, 4, 5-T production at the Nitro Plant. In order to satisfy their government contracts for Agent Orange, the defendants were required to redirect many of their resources, including their supplies of 2, 4, 5-T, towards the production of Agent Orange. (Love Cert., Exs. B, F.) The defendants' government contracts legally required them to prioritize the government's demand for 2, 4, 5-T used for Agent Orange production over the demands of their civilian customers. (*Id.*) Much of the 2, 4, 5-T specifically produced at the Nitro Plant was diverted during the 1960s for the production of Agent Orange. (*Id.*, Ex. M.) In some months, all of the 2, 4, 5-T manufactured at the Nitro Plant was used for Agent Orange production. (*Id.*)

The defendants' distribution of 2, 4, 5-T from the Nitro Plant demonstrates that the federal government's demand for Agent Orange and its control over the defendants' 2, 4, 5-T production were inextricably intertwined. An illustration of this relationship can be found in a letter from the

United States Department of Commerce to the Monsanto Company, dated March 24, 1967.  (*Id.*, Ex.

A.)  In that letter, Monsanto is directed to increase the rate at which it was delivering Agent Orange

and also to provide a monthly report of its 2, 4, 5-T inventory.  (*Id.*)  The letter further provides that

Monsanto may obtain tetrachlorobenzene ("TCB"), a necessary ingredient for 2, 4, 5-T, by placing

a DO-rated order[7] on its supplier.  (*Id.*)  Government documents show that Monsanto replied that

it could comply with the directive as long as it could obtain 600,000 pounds of TCB per month in

order to "allow Monsanto to operate its 2, 4, 5-T facility at maximum production rate."  (*Id.*)

Monsanto further stated that it would not be able to deliver the requested amount of Agent Orange

unless "TCB is received at Nitro, W. Va."  (*Id.*)  This correspondence shows that the 2, 4, 5-T

produced at the Nitro Plant was at times conscripted entirely for the production of government-

demanded Agent Orange.  It further demonstrates that the federal government directed the amount

of 2, 4, 5-T produced at the Nitro Plant and at times utilized its authority to facilitate the necessary

2, 4, 5-T production at the Agent Orange plant.

The defendants have provided other evidence suggesting federal control over 2, 4, 5-T

production at the Nitro Plant.  First, there is some indication that the Department of Defense may

have contracted directly for 2, 4, 5-T rather than for Agent Orange.  (*Id.* at F.)  Also, the defendants

have offered evidence that the federal government provided the defendants with specifications for

the composition of the 2, 4, 5-T being produced at the Nitro Plant.  (*Id.*, Exs. C, G, H.)

---

[7]  At the time that the federal government ordered Agent Orange from the defendants, the
federal government utilized a rating system for its procurement orders.  *Ryan*, 781 F. Supp. at 938.
A DO-rating designated a category of government procurement orders.  *Id.* According to the
government's regulations, all rated orders, including DO- rated orders, were required to "be accepted
and filled regardless of existing contracts and orders."  *Id.* (quoting Business and Defense Services
Administration Regulation 2 § 10.)

In summary, the record shows that some aspects of the defendants' production of 2, 4, 5-T at the Nitro Plant occurred under more than merely the "general auspices" of a federal officer. Indeed, the record demonstrates "strong government intervention." *Pack*, 838 F. Supp. at 1103. The federal officers issued direct and detailed orders controlling the amount of 2, 4, 5-T produced at the Nitro Plant and to whom the defendants could deliver the substance. Further, since the 2, 4, 5-T was being used for federal government purposes, it was being produced pursuant to government specifications. Even though the defendants were producing 2, 4, 5-T prior to entering into government contracts for the production of Agent Orange, and even though they were also supplying 2, 4, 5-T to civilian clients, the defendants' Nitro Plant 2, 4, 5-T production throughout the 1960s in part carried out the tasks of the federal government. *See Isaacson*, 517 F.3d at 137 (finding that defendants were acting under government control when it produced Agent Orange because they were "provid[ing] a product that the Government was using during war—a product that, in the absence of the Defendants, the Government would have had to produce itself").

Accordingly, the plaintiffs' argument against removal based on the fact that the defendants' government contracts were for Agent Orange rather than for 2, 4, 5-T is unavailing. Although the distinction between 2, 4, 5-T and Agent Orange as the object of the government contract is relevant for establishing a causal nexus in products liabilities cases involving the government specified formulation for Agent Orange, *see Isaacson*, 517 F.3d at 137-38; *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 399-400 (5th Cir. 1998), the specific terms of the defendants' contract are not dispositive as to whether the defendant conducted actions under the control of the federal government. In this case, even though the defendants' contracts with the federal government may have only been for Agent Orange rather than for 2, 4, 5-T, the record shows that those contracts gave

-22-

rise to the federal government's direct and detailed control over the amount of 2, 4, 5-T produced and the purposes for which the substance was used. Therefore, I **FIND** that the defendants were acting under federal direction when it produced 2, 4, 5-T at the Nitro Plant for some period during the 1960s.

### c. The Defendants Cannot Establish A Causal Nexus Between Its Actions Under Federal Control and the Actions Underlying the Claims

The plaintiffs also argue, however, that even if the defendants can show that they produced substances at the Nitro Plant under the control of a federal officer, federal officer removal is still improper because no federal contract specified the method of disposing the toxic byproducts of 2, 4, 5-T. (*Id.* at 13.) In other words, the plaintiffs argue that there is no causal nexus between the defendants' acts under federal control and the acts underlying the Complaint.[8] The plaintiffs argue that the instant action "has always unequivocally been about Old Monsanto's dumping of 2, 4, 5-T waste . . . ."[9] (Mem. Supp. Mot. Remand Subject Matter Juris. 6.) As I discussed above, I agree

---

[8] The plaintiffs assert this argument as a sort of worst-case scenario. They argue that "even assuming that [the defendants] did manufacture Agent Orange at its old Nitro plant (which it did not) and assuming that [the plaintiffs] did allege exposure to emissions from the Old Nitro plant during the 2, 4, 5-T manufacturing process (which he did not)," the defendants still cannot show that the federal government controlled emissions from the Nitro Plant. (Pls. Mem. Supp. Mot. Remand Subject Matter Juris. 12-13; *see also id.* at 16-17.) I will not address this exact argument for two reasons. First, as I discussed earlier, the plaintiffs' Complaint alleges injuries solely from the defendants' disposal of toxic dioxins at the Manila Creek dump site and not from any emissions from the Nitro Plant. Second, the plaintiffs' argument again conflates the "acting under" element and the "causal nexus" element for establishing grounds for federal officer removal. The defendants need not show that the federal government directly controlled its disposal practices, whether emissions or dumping. They only need to show a causal nexus between those acts of disposal and the acts that occurred under federal control. *See Isaacson*, 517 F.3d at 137-38. I will pursue the question of whether the defendants have made such a showing.

[9] Both the plaintiffs and the defendants disagree about whether the dioxin contamination of
(continued...)

with this characterization of the plaintiffs' claims.  Therefore, I must determine whether there is a

causal nexus between the acts undertaken by the defendants under the direction and control of the

federal government and the defendants' practice of disposing waste at the Manila Creek site.

---

[9](...continued)
the Manila Creek dump site and watershed could have been caused by the defendants' actions other than the disposal at the Manila Creek dump site itself.  The plaintiffs argue that "[t]here is no pleading or other paper filed in *Carter* that remotely suggests that the dioxin contamination at issue in *Carter* is the result of anything other than the dumping of toxic waste at the Manila Creek dump site and the subsequent waterborne contamination such dumping created."  (Pls. Mem. Supp. Mot. Remand Subject Matter Juris. 7.)  According to the defendants, however, the overlap between the *Carter* and *Bibb* plaintiff classes indicates that "*all* of the properties [of the class members] which have allegedly suffered contamination through waterborne dioxin also have allegedly been contaminated by airborne dioxin suggest[ing] that the underlying issues of the *Carter* and *Bibb* cases are inexorably intertwined."  (Defs.' Resp. Opp'n Mot. Remand Subject Matter Juris. 9.)  The defendants also question the plaintiffs' ability to allege injuries based solely on dioxin contamination in the water: "Perhaps Plaintiff's Counsel believes it will be able to prove which of Monsanto's purported dioxin (if any) contaminating the land adjacent to Plaintiff's waterways fell from the air, and which washed up onto land from the water.  Again, this is not likely."  (*Id.*)

The question of whether the contamination of the Manila Creek watershed was caused by direct disposal at the Manila Creek dump site or by airborne emissions is not relevant to the instant motion.  The only question before the court is whether the actions underlying the plaintiffs' Complaint occurred under the control of a federal officer such that the defendants can make out a colorable federal defense and remove the action to federal court.  The actions underlying the plaintiffs' Complaint, as discussed above, are the disposal of dioxin and other 2, 4, 5-T waste into the Manila Creek dump site.  The plaintiffs will have the burden at trial to show that the disposal at the dump site caused their injuries.  If the defendants show that the contamination and injuries were caused by another action—for example, the airborne emission of dioxins from the Nitro Plant which may have occurred under federal control—then the plaintiffs cannot succeed in this action.  Accordingly, the fact that the injuries alleged in this action may have in fact been caused by some separate conduct by the defendants that might have occurred under federal control is irrelevant to the jurisdictional question.

Moreover, because I have found that the plaintiffs do not allege injuries for airborne emissions from the Nitro Plant, I need not consider either parties' arguments concerning the government's control over such emissions.  (*See* Mem. Supp. Mot. Summ. J. Subject Matter Jurisdiction 12, 16.)

   **i.**   **There is No Causal Nexus Between the Production and Distribution of 2, 4, 5-T Under Federal Control and the Disposal of 2, 4, 5-T Byproducts at the Manila Creek Dump Site**

Though I have found that the federal government controlled certain aspects of the 2, 4, 5-T production at the Nitro Plant, my review of the documents provided by the defendants reveals that the scope of that control was very narrow.  I **FIND** that there was no causal nexus between the defendants' production and distribution of 2, 4, 5-T at the Nitro Plant under federal control and the defendants' disposal of 2, 4, 5-T waste at the Manila Creek dump site.  The defendants have shown that the federal government controlled the chemical composition of 2, 4, 5-T, the amount of 2, 4, 5-T that was produced at the Nitro Plant, and the manner in which 2, 4, 5-T was distributed.  They have not provided any evidence that those production parameters led them to dispose of the 2, 4, 5-T waste at the Manila Creek site.  It is true that the defendants were required to dispose of the waste from the 2, 4, 5-T that was provided to the government in *some* fashion.  But the circumstances leading to the disposal at the Manila Creek dump site existed prior to the federal government's involvement.  The defendants produced 2, 4, 5-T prior to entering government contracts for Agent Orange and continued to sell the substance to civilians even while diverting 2, 4, 5-T for government use.  Therefore, even absent the federal government's demand for 2, 4, 5-T, the defendants were producing 2, 4, 5-T and disposing of its waste in some manner.  They were not required to dump 2, 4, 5-T waste into the Manila Creek dump site because of the government's demand for Agent Orange.  *See Campbell*, 2008 WL 4415078, at *4 (finding no causal nexus between the defendants' actions and the actions undertaken pursuant to federal control because "[t]here were no orders or direction from federal officers that prevented [the defendant] from fulfilling its duties to the plaintiffs."); *see also Isaacson*, 517 F.3d at 137-38.

The case of *New Jersey Department of Environmental Protection v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398 (D.N.J. 2005), provides persuasive support for my conclusion. In that case, the district court considered its federal officer removal jurisdiction over claims based on the defendant's waste disposal practices. The plaintiff had brought an action pursuant to a New Jersey statute for cleanup and removal costs, and also for damages allegedly caused by discharges at the defendant's property. *Id.* at 401. The defendant removed the action pursuant to § 1442(a), arguing that "certain of its production activities during World War II were at the behest of and under the control of the federal government, and these activities resulted in the disposal of products included in the conduct alleged against it . . . ." *Id.* The plaintiff sought remand, arguing that federal officer removal was inappropriate. Even if the defendants produced, stored, and transferred certain products under government control, the plaintiff argued, the government did not control the improper disposal of hazardous wastes. *Id.* at 404. Therefore, there was no causal nexus between the actions conducted under government control (the production, storage, and transfer of the products) and the conduct charged in its claim (the "improper disposal of toxic substances into the waters of the [s]tate . . . ."). *Id.*

The district court examined the case law presented by the parties and distinguished the defendant's cases. The district court observed that all of the defendant's cases were "personal injury products liability actions in which the actual *production* of toxic substances ordered by the government gave rise to the alleged harm." *Id.* at 404-05. The plaintiff, however, had provided cases alleging harms caused by the *disposal* of hazardous substances produced under government control. In those cases, the courts had rejected federal officer removal. *Id.* at 405.

The court specifically cited to two cases: *Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965 (D.Ariz. 1992), and *Arness v. Boeing N. Am., Inc.*, 997 F. Supp. 1268 (C.D. Cal. 1998).  In *Bahrs*, a plaintiff class brought suit alleging injuries caused by the defendants' alleged dumping of toxic substances and contamination of the plaintiffs' water supply.  795 F .Supp. at 967.  One of the defendants was a military contractor that sought removal under § 1442(a).  The district court explained that the defendant's government contract provided an insufficient basis for federal officer removal.  It explained: "While the government officials were undoubtedly most interested in the production of war materials, the record before this Court does not demonstrate the government's necessary control over the method of waste disposal. The mere fact that the government possessed the power to exercise control over the project does not establish that the power was in fact ever exercised." *Id.* at 970.

In *Arness*, the plaintiffs brought suit against the defendants based on the defendants' "alleged release of [toxic chemicals] from their activities at [certain facilities] which allegedly resulted in the contamination of the surrounding area's groundwater, soil and subsurface oil."  997 F. Supp. at 1270.  The plaintiffs alleged that the defendant's conduct exposed them to the toxic chemicals and they sought damages for injuries caused by that exposure.  *Id.*  The defendants asserted that they conducted activities at those facilities under government contracts and at "the direction of federal officers pursuant to detailed and comprehensive procedures dictated by these officers." *Id.* (quoting Barrett Decl. ¶ 5).  Specifically, the defendants asserted that the government's production requirements mandated the flushing of rocket engines with the toxic chemicals that allegedly contaminated the surrounding environment.  *Id.* at 1273.  The district court observed, however, that the defendants' "use of [toxic chemicals] did not cause Plaintiffs' injuries.  Rather, Plaintiffs'

-27-

injuries were allegedly caused by [the defendants'] negligent disposal and storage of [the chemicals], which activities were not performed at the government's behest." *Id.* at 1274-75.  Moreover, the government's failure to specify storage and disposal practices for the toxic chemicals despite mandating their use could not establish a causal nexus.  *Id.* at 1275.  The court concluded that: "because the government did not specify safeguards that BNA must use, or restrict BNA's ability to implement safeguards, BNA was not acting under federal direction when it allegedly released the TCE.  Rather, the acts relevant to Plaintiffs' suit occurred only 'under the general auspices of' a federal officer." *Id.* at 1275 (quoting *Fung*, 816 F. Supp. at 572).  The court remanded the action.

The defendants cite to *Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2d Cir. 2008), to support their argument that there is a causal nexus between the federal control over the manufacturing at the Nitro Plant and the acts underlying the instant action.  In *Isaacson*, the plaintiff sued on a theory of products liability.  The plaintiff, a Vietnam War veteran, alleged that he was exposed to Agent Orange produced by the defendants while serving in that war and that the Agent Orange was contaminated by toxic dioxins.  The Second Circuit identified a causal nexus between the Agent Orange production that occurred under federal direction and the production of dioxin: "[E]ven if Plaintiffs were to prove that the dioxin contamination occurred because of an act not specifically contemplated by the government contract, it is enough that the contracts gave rise to the contamination." *Id.* at 138.

But *Isaacson* is distinguishable.  *Isaacson* was a products liability case based on the contamination of Agent Orange by dioxins.  The defendants' actions underlying *Isaacson* was the manufacturing of Agent Orange itself, which was composed according to a government-specific formulation that was not also being provided to civilian contractors.  The instant action is not a

products liability case.  The actions underlying the plaintiffs' claims in this case do not involve Agent Orange, or even 2, 4, 5-T production.  Instead, they involve the defendants' disposal of 2, 4, 5-T's toxic byproducts, and that disposal occurred without any federal involvement.  Accordingly, *Isaacson* does not support the defendants' argument that there is a causal nexus between the federal control over the manufacturing at the Nitro Plant and the acts underlying the instant action.

The above cases make clear that the government's control over certain aspects of production cannot provide a basis for federal officer removal for an action asserting claims solely based on the defendants' waste disposal practices because there is no causal nexus between the production activities conducted under government control and the disposal practices controlled by the defendant alone.  Therefore, the defendants in this matter cannot establish a basis for federal officer removal unless the defendants disposed of the 2, 4, 5-T waste under the direct and detailed control of the federal government or in furtherance of a specific request by a federal officer.

> ii.    **The Plaintiffs' Claim Based on the Defendants' Engagement in an Abnormally Dangerous Activity Does Not Establish A Causal Nexus Satisfying the Requirements for Federal Officer Removal**

The defendants argue, however, that the causal nexus requirement is satisfied by virtue of the plaintiffs' claim that the defendants' conduct constituted an "abnormally dangerous activity." (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 27.)  The defendants assert that "[w]here a plaintiff argues that a defendant should be held liable because that defendant has engaged in some type of abnormally dangerous/ultrahazardous activity . . . it is enough to satisfy the causal nexus requirement that the basic activity itself was performed pursuant to a contract with the federal government."  (Defs.' Resp. Mot. Summ. J. Subject Matter Juris. 15.)  In support of this assertion,

the defendants cite to *Campbell v. Brook Trout Coal LLC*, No. 2:07-cv-0651, 2008 WL 4415078 (S.D. W. Va. Sept. 25, 2008) (Copenhaver, J.).

In *Campbell*, the plaintiffs were employed by government contractors hired to demilitarize United States Army munitions containing a highly toxic substance. 2008 WL 4415078, at *1. The plaintiffs filed suit in state court and raised several claims based on their exposure to the toxic substance. In one of their claims, the plaintiffs alleged that the defendants were strictly liable for their injuries caused by exposure to "an ultra-hazardous product and working conditions." *Id.* at *5. After the defendants removed the case, the court determined that a causal connection existed between the defendants' actions pursuant to its federal government contract and the plaintiffs' exposure to the toxic substance because the plaintiffs' exposure occurred as a result of the defendants' duty under its contract. *Id.* at *6. In other words, a causal connection existed because the government contract itself required the defendants to hire the plaintiffs in positions where they would be exposed to the hazardous substances.

Though *Campbell* would be persuasive if the actions underlying the plaintiffs' abnormally dangerous activity claim were actions conducted pursuant to a federal government contract, that is not the case. The actions underlying the plaintiffs' claim are the disposal of 2, 4, 5-T toxic byproducts at the Manila Creek dump site.[10] As discussed above, the disposal of 2, 4, 5-T did not

---

[10] The plaintiffs clearly describe the "abnormally dangerous activity" in their Complaint as the "defendants' [aforesaid] conduct." (Notice Removal, Ex. 1, Corrected 4th Am. Compl. ¶ 27.) Unlike in *Campbell*, where the court found that the ultra-hazardous product claim was based on different conduct than the conduct underlying the other claims, the plaintiffs' "abnormally dangerous activity" claim in the instant matter is based on the same conduct that underlies all of the claims. I can find no grounds for finding that the plaintiffs have based this single claim on the defendants' production of 2, 4, 5-T (as the defendants allege) rather than the disposal practices that underlie the rest of their claims.

occur pursuant to a federal contract or under federal control.  Moreover, there is no causal nexus between the defendants' production and distribution of 2, 4, 5-T under federal government control and their subsequent disposal of 2, 4, 5-T waste at the Manila Creek dump site.  Accordingly, the fact that the disposal may have been an abnormally hazardous activity conducted by the defendant cannot establish grounds for federal officer removal.

Because I find that the defendants cannot establish a causal nexus between its actions pursuant to the control of the federal government and the actions underlying the plaintiffs' claims, I **FIND** that this matter was improperly removed under § 1442(a).[11]

### III.   Defendants' Removal Does Not Warrant The Imposition Of Fees And Costs

The plaintiffs argue that because the defendants misrepresented the scope of the plaintiffs' claims and because they could not provide evidence supporting federal officer removal, the defendants lacked any "objective or reasonable basis for asserting federal officer removal jurisdiction . . . ."  (Pls.' Mem. Supp. Mot. Remand Subject Matter Juris. 17.)  My discussion of this matter clearly demonstrates the complexity of the jurisdictional question in this case.  I cannot find that the defendant "lacked an objective, reasonable basis for their removal."  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005).  The Plaintiffs' request to recover costs and attorneys fees is **DENIED**.

### IV.   Conclusion

For the reasons stated, the  plaintiffs' Motion to Remand for Lack of Subject Matter Jurisdiction [Docket 35] is **GRANTED** but their request for costs and attorneys fees is **DENIED**.

---

[11]  Because I have found that federal officer removal is inappropriate based on the absence of a causal nexus, I will not address either parties' arguments regarding whether the defendants can present a colorable government contractor defense.  (Pls.' Reply at 9-10.)

The Motion to Remand for Voluntary Dismissal or in the Alternative for Voluntary Dismissal [Docket 50] is also **DENIED**.  This action is **REMANDED** to the Circuit Court of Putnam County, West Virginia.  The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party, and a certified copy of this Order to the Circuit Court Clerk of Putnam County, West Virginia.

ENTER:      June 19, 2009

Joseph R. Goodwin, Chief Judge